U.S. MAGISTRATE COURT
JSH – SDTX
FILED

OCT 16 2012 JSH

David J. Bradley, Clerk
Laredo Divison

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 5:12-cr-539 |
| | § | |
| ALEXIS CINCADE WASHINGTON | § | |

## REPORT & RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Defendant Alexis Cincade Washington's ("Defendant") "Motion to Suppress Evidence." (Dkt. No. 20). In the motion, Defendant asks the Court to "suppress any and all evidence acquired by the government as a result of the illegal custodial search and seizure by law enforcement agents . . . ." (*Id.* at 1). Defendant also seeks for the Court to "suppress any statements taken in violation of Defendant's rights." (*Id.*).

The Government filed a response to Defendant's motion on August 9, 2012, (*see* Dkt. No. 24), arguing that the detention was brief; that there was a canine alert; and that said canine alert constituted probable cause. In its response, the Government did not address whether Defendant's statements were illegally obtained. On August 20, 2012, United States District Judge George P. Kazen referred the instant motion to the undersigned. (Dkt. No. 26). A hearing was held in this matter on September 5, 2012 ("September 5th Hearing"). The Government called three witnesses to testify: Border Patrol Agent Juan C. Meza, Border Patrol Agent Luis Pena, and DEA Task Force Agent Victor M. Barberena. Defendant testified on his own behalf.

For the reasons discussed below, the undersigned RECOMMENDS that that the District Judge, after an independent review, finds that Defendant's motion to suppress be DENIED.

## I. BACKGROUND

On June 2, 2012, at approximately 1:37 p.m., a white single-cab tractor truck ("tractor") with Texas license plates approached the primary lane of the United States Border Patrol checkpoint on Highway 59, sixteen miles west of Freer, Texas. (*See* Sept. 5th Hr'g, Gov't Ex. 5).[1]   Taped to both the driver and passenger-side doors were cardboard signs with the handwritten phrase "In Tow Not for Hire." (Sept. 5th Hr'g at 9:54 a.m., 10:47 a.m.; *see* Sept. 5th Hr'g, Gov't Ex. 2).  The tractor did not have any company logo or company name; nor did it have a registration or US DOT number. (Sept. 5th Hr'g at 9:54 a.m., 10:47 a.m.; *see* Sept. 5th Hr'g, Gov't Ex. 1).  As the tractor slowed to a halt in the primary inspection lane at around 1:37:29 p.m.,[2] both Agent Meza and Agent Pena approached the driver's side of the vehicle at the same time. (*See* Sept. 5th Hr'g, Gov't Ex. 5).  As noted below, what occurred after these two agents approached Defendant's tractor is largely contested.

### A. Government's Testimony

Agent Pena, a nearly four-year veteran of Border Patrol, testified that he was checking vehicles in the primary lane when he approached Defendant's tractor. (Sept. 5th Hr'g at 10:46 a.m.).  Agent Pena identified himself as a Border Patrol agent and

---

[1] The Government's Exhibit Number 5 is a video of the immigration inspection of Defendant at Freer Border Patrol Station on June 2, 2012.

[2] The Court here notes the exact times because the timing of the events was made to be a central issue by the parties during the hearing.  The video of the immigration inspection of Defendant was played during the testimony of the witnesses.

asked if Defendant was a United States' citizen. (Sept. 5th Hr'g at 10:46 a.m.). During this time, Agent Meza, the canine handler, simultaneously advanced toward the back cargo door on the driver's side with his canine, Bandit, to conduct a downwind exterior search of the tractor. (*See* Sept. 5th Hr'g, Gov't Ex. 5; Sept. 5th Hr'g at 9:58 a.m.). Agent Meza testified that he noted that that Bandit alerted to the presence of narcotics and/or hidden persons at the cargo door seam at 1:37:31 p.m. (Sept. 5th Hr'g at 9:59-10:00 a.m., 10:05 a.m.). Consequently, he advised Agent Pena to ask Defendant for consent to search the vehicle, and to ask Defendant to open the cargo door.[3] (Sept. 5th Hr'g at 9:59-10:00 a.m.). According to Agent Pena, once he was given the "cue" by Agent Meza, he asked Defendant if he could look inside the sleeper compartment, and also if Defendant would open the small cargo door on the lower side of the tractor. (Sept. 5th Hr'g at 10:48 a.m.). Notably, Agent Meza testified that he heard Agent Pena ask Defendant for his consent. (Sept. 5th Hr'g at 10:02 a.m.). Agent Pena stated Defendant gave a verbal response, "yes." (Sept. 5th Hr'g at 10:48 a.m.). Agent Pena further testified that he was satisfied with Defendant's immigration status as soon as Defendant responded that he was a United States citizen, which he indicated occurred around 1:37:33 p.m. (Sept. 5th Hr'g at 10:47 a.m., 11:02 a.m.).

Soon thereafter, Agent Meza opened the rear cargo door[4] at 1:37:37 p.m., (*see* Sept. 5th Hr'g, Gov't Ex. 5), to allow Bandit to pinpoint the actual source. (Sept. 5th Hr'g at 10:00 a.m.). Agent Meza relayed that usually the cargo compartment contains tools,

---

[3] Agent Pena explained that Agent Meza did not explicitly state that Bandit had alerted, for security reasons. (Sept. 5th Hr'g at 10:48 a.m.). However, when Agent Meza informed him to ask for permission to "check in the bed, in the back of the . . . tractor," that was a cue for Agent Pena that there had been a canine hit.

[4] According to Agent Meza, the cargo door was opened by the Defendant via a latch on the inside of the tractor once Agent Pena asked Defendant for consent. (Sept. 5th Hr'g at 10:03 a.m.).

but that in this case the cargo compartment was completely empty, except for something in the middle blocking his view through to the passenger side. (Sept. 5th Hr'g at 10:01 a.m.). Agent Meza therefore pulled Bandit away from the rear cargo door at 1:37:58 p.m. in order to lead Bandit toward the back of the vehicle and around to the passenger side cargo door to continue to allow Bandit to pinpoint the source. (Sept. 5th Hr'g at 10:01 a.m., 10:09 a.m., 10:22 a.m.).

Just after Agent Meza began looking inside the cargo compartment, Defendant opened the driver's side door of the tractor, and Agent Pena stepped up on the tractor at 1:37:42 p.m. (Sept. 5th Hr'g at 10:49 a.m.; *see* Sept. 5th Hr'g, Gov't Ex. 5). According to Agent Pena, he then asked Defendant what was in the sleeper compartment area, and Defendant replied that there were mechanical parts. (Sept. 5th Hr'g at 10:49 a.m.). Agent Pena's testimony indicated that Defendant, with his right hand, opened the curtains to the sleeper compartment, exposing a number of bundles wrapped in clear cellophane. (*Id.*; *see* Sept. 5th Hr'g, Gov't Ex. 4).

Agent Pena asked Defendant a second time what he had in the back of the compartment, and again Defendant stated that there were mechanical parts. (Sept. 5th Hr'g at 10:54 a.m.). The agent then instructed Defendant to get out of the tractor, and Defendant was escorted toward the Border Patrol station. (*Id.*). The Court notes that the video, (Sept. 5th Hr'g, Gov't Ex. 5), shows a third agent leading Defendant across the front of the tractor into the Border Patrol station at 1:38:38 p.m. (*See id.*). Thus, the entire sequence of events, from when the agents approached Defendant's tractor to the time when the third agent escorted Defendant around the front of the tractor, lasted only sixty-nine seconds.

Once Defendant was inside the Border Patrol station, DEA agents were notified via telephone of the seizure at the Freer checkpoint. (Sept. 5th Hr'g at 11:18 a.m.). DEA Agent Barberena received the phone call around 2:30 p.m., and after gathering the equipment, picking up his partner, DEA Agent Steven Schappert, and driving the sixty miles to the checkpoint, Agent Barberena arrived around 4:30 p.m. (Sept. 5th Hr'g at 11:19 a.m.). After their arrival, Agents Barberena and Schappert began eliciting the details of the case from the Border Patrol agents. (*Id.*).

Soon thereafter, Agent Barberena and Agent Schappert went into the holding cell where Defendant was being detained, around 5:00 p.m. (*Id.*). The holding cell was a ten by ten foot room with "a sitting area and water containers." (Sept. 5th Hr'g at 11:20 a.m.). At the beginning of the questioning, there were three agents present: Agent Barberena, Agent Schappert, and Agent Cantu, an Intelligence Officer with Border Patrol from that station. (Sept. 5th Hr'g at 11:30 a.m.). During the questioning, both Agent Schappert and Agent Cantu would have to leave periodically due to work-related or personal matters. (*Id.*). At times, Agent Barberena was the only agent in the room with Defendant.

Agent Barberena testified that Agent Schappert read Defendant his *Miranda* warnings from a DEA-13A card, and Defendant acknowledged his rights, and stated that the agents could speak with him. (Sept. 5th Hr'g at 11:21-11:23 a.m.). At that point, they explained to Defendant why he was being detained—"that there were large amounts of marijuana in the sleeper cab." (Sept. 5th Hr'g at 11:23 a.m.).

Agent Barberena then testified that Defendant denied knowing there was marijuana in the tractor. (*Id.*). Consequently, Defendant was asked to explain to the

5

agents what had occurred, leading up to Defendant's arrival at the Border Patrol checkpoint. (*Id.*). Defendant explained that he had been offered work by a friend, Robert, because he had been out of work due to an injury. (*Id.*). Defendant then told the agents that this work entailed driving the tractor from Roma, Texas to Corpus Christi, Texas, for two-hundred dollars. (Sept. 5th Hr'g at 11:24 a.m.). Defendant further explained that he had taken a bus from Louisiana to McAllen, Texas, and waited for five days before the vehicle was ready on June 2, 2012. (Sept. 5th Hr'g at 11:25 a.m.). For those five days, another person, named John, told Defendant how they were going to move the tractor. (Sept. 5th Hr'g at 11:24 a.m.). Defendant also stated that John took him to go get the tractor at one point, but that it was not ready, and so Defendant was taken back to the hotel. (Sept. 5th Hr'g at 11:25 a.m.). Defendant claimed that John was paying for his bus ticket and the hotel expenses. (*Id.*). From Roma, Texas, Defendant was given a specific route — Highway 83 to Highway 59 to Highway 44 — to travel to Corpus Christi, Texas. (*Id.*). The agent observed Defendant's demeanor to be calm throughout the conversation. (Sept. 5th Hr'g at 11:23 a.m.). At the conclusion of Defendant's account of the events, Agent Barberena told Defendant that his story was "bullshit."[5] (Sept. 5th Hr'g at 11:27 a.m., 11:35 a.m.). Agent Barberena then stated that Defendant was told that his case would be presented to the Assistant United States Attorneys ("AUSA") and "that story was not going to fly." (Sept. 5th Hr'g at 11:28 a.m.). The conversation lasted about thirty minutes before Agent Barberena left the holding cell. (Sept. 5th Hr'g at 11:23-11:26 a.m.). Instead of immediately making a call to the AUSA,

---

[5] Agent Barberena confronted Defendant with the fact he thought his story was not credible because he questioned why anyone would pay the expense of bringing a driver all the way from Louisiana to Roma, Texas, just to move a tractor to Corpus Christi, Texas, for two-hundred dollars. (Sept. 5th Hr'g at 11:26-11:27 a.m.). Supposedly, there would also be someone waiting for Defendant in Corpus Christi who would take him to the Greyhound station so that he could return home. (Sept. 5th Hr'g at 11:27 a.m.).

Agent Barberena thought he would give Defendant "time to think and give him the opportunity to tell the truth" before making that call. (Sept. 5th Hr'g at 11:41 a.m.).

Approximately ten minutes later, Agent Barberena returned to the holding cell. (Sept. 5th Hr'g at 11:41 a.m.). He again told Defendant about the seriousness of the situation. (Sept. 5th Hr'g at 11:35 a.m.). Agent Barberena informed Defendant that, due to the large amount of drugs, there was a lot of incarceration time at stake. (Sept. 5th Hr'g at 11:36 a.m.). Agent Barberena then told Defendant to tell him what happened, because the agent would have to relay the story to the AUSA. (Sept. 5th Hr'g at 11:28 a.m.). Defendant then stated that people were going to kill his family, and that he needed witness protection. (Sept. 5th Hr'g at 11:28 a.m.). Agent Barberena reiterated that he needed to know the facts of the case before talking to an AUSA. (*Id.*). Defendant then requested to speak with an AUSA personally, but Agent Barberena told him that was not possible. (*Id.*). Defendant at that point stated he wanted an attorney, and thus the questioning ceased. (*Id.*). The conversation lasted between forty-five minutes and one hour. (Sept. 5th Hr'g at 11:29 a.m.). Agent Barberena further testified that they did not threaten Defendant or make him any promises of leniency during the questioning. (Sept. 5th Hr'g at 11:29 a.m., 11:43 a.m.).

**B. Defendant's Testimony**

As noted above, Defendant's testimony differs from that given by the agents. Defendant is a forty-five-year-old man with one semester of college education. (Sept. 5th Hr'g at 11:58 a.m.). He has been employed as a truck driver for the past eleven or twelve years. (*Id.*). Defendant testified that as his tractor came to a stop at the Freer checkpoint, he noted that the Border Patrol agents were displaying their weapons on their belts.

7

(Sept. 5th Hr'g at 11:59 a.m.). Contrary to Agent Pena's testimony, Defendant stated that he was never asked about his citizenship. (Sept. 5th Hr'g at 12:01 p.m.). Rather, Agent Pena asked him only if he had "anybody riding with [him] or any illegal drugs." (Sept. 5th Hr'g at 12:00 p.m.). Defendant was at no point asked for consent to search his vehicle, but was merely told by the Border Patrol agent to "open the door" after the agent asked his initial question. (Sept. 5th Hr'g at 12:01-12:02 p.m.). According to Defendant, Agent Pena gave no reason as to why he wanted Defendant to open the door, nor was Defendant told that he could refuse the agent's order. (Sept. 5th Hr'g at 12:02 p.m.). Additionally, Defendant denied opening the rear cargo door. (Sept. 5th Hr'g at 12:03 p.m.). He stated that Agent Meza opened the door on his own. (*Id.*). Defendant was thereafter told to step out of the vehicle. (*Id.*).

Once inside the Border Patrol building, Defendant was placed in a glass holding area, which allowed Defendant to see the agents removing the bundles of marijuana from the tractor. (Sept. 5th Hr'g at 12:04 p.m.). Defendant testified that he figured out it was marijuana by the time the agents were unloading the bundles. (Sept. 5th Hr'g at 12:14 p.m.). Defendant noted that the Border Patrol agents appeared "happy" stacking the bundles of marijuana. (Sept. 5th Hr'g at 12:04 p.m.). Defendant was thereafter moved to a second glass holding area inside the station. (Sept. 5th Hr'g at 12:05 p.m.). Eventually, Defendant was placed in what he described as a typical holding cell, one with "heavy door[s]" and "keys." (Sept. 5th Hr'g at 12:07 p.m.). This is the room where Defendant was ultimately interviewed. (*Id.*). There was a single window in the holding cell, through which Defendant could see the interior of the station. (Sept. 5th Hr'g at 12:08 p.m.). Also visible to Defendant were the numerous marijuana bundles, which the agents

had moved from outside.[6]  (*Id.*; *see* Def. Ex. 3).  The agents were "weighing [the bundles], marking them, and restacking them." (Sept. 5th Hr'g at 12:08 p.m.).  Also noticeable to Defendant was a conspicuous sign on the bundles, delineating the weight and estimated street value of the marijuana seized.  (*Id.*; *see* Def. Ex. 2.)  It was this written sign, indicating that the numerical street value of the marijuana was $507,520, which caused Defendant's "heart [to] fall in [his] drawers." (Sept. 5th Hr'g at 12:08 p.m.).  He testified that he would "never forget that because what could happen to [him] behind it—it's a lot." (Sept. 5th Hr'g at 12:09 p.m.).

Defendant stated that it "seemed like forever" before the DEA agents arrived. (Sept. 5th Hr'g at 12:10 p.m.).  Defendant further testified that, once the agents arrived, they did not read him his *Miranda* warnings. (*Id.*).  Instead, Defendant stated that the agents notified him there were a lot of drugs, and "it was a lot of trouble." (Sept. 5th Hr'g at 12:12 p.m.).  Defendant claimed that Agent Barberena informed him that "if he told [Agent Barberena] what was going on, [Agent Barberena] could probably let [him] go." (*Id.*).  Upon hearing this, Defendant felt "relieved." (Sept. 5th Hr'g at 12:11 p.m.).  Defendant explained that it was because of Agent Barberena's assurances that he started talking. (*Id.*).  Once Defendant finished relaying his story, the agent told him it was "bullshit," and that he did not believe Defendant. (*Id.*).

After Agent Barberena left Defendant alone for ten to fifteen minutes, he returned to tell Defendant that he was going to "call to have [him] arrested." (Sept. 5th Hr'g at 12:12 p.m.).  During Defendant's testimony, when he was asked by his counsel "if Agent Barberena had read [him his] rights, and hadn't told [him] that he could let [him] go,

---

[6] Agent Barberena acknowledged that he could see the marijuana bundles from the vantage point where he was interviewing Defendant, and thus Defendant could surely see both the bundles and the sign from his holding cell. (Sept. 5th Hr'g at 11:34 a.m.).

would [he] have talked to Agent Barberena," Defendant stated that "no, [he] would have asked for an attorney." (*Id.*). Defendant also confirmed that he asked Agent Barberena to speak with the prosecutor and that the request was refused. (Sept. 5th Hr'g at 12:14 p.m.). At that point, Defendant requested an attorney. (Sept. 5th Hr'g at 12:19 p.m.).

### C. Credibility Determination

Given the differing testimony of the events that transpired on June 2, 2012, the undersigned finds that the testimony of DEA Agent Barberena, Border Patrol Agent Pena, and Border Patrol Agent Meza is credible. Consequently, the Court finds that most of Defendant's testimony is not credible. The Court understands that there are instances of law enforcement transgressions and negligent acts that impinge on an individual's rights. However, during the hearing, Defendant's version of the events appears to have an element of untruthfulness from beginning to end.

First, it seems less than plausible that Agent Pena's interaction with Defendant involved a singular question of whether Defendant had "anybody riding with [him] or any illegal drugs," followed by two instructions directing Defendant to open the driver's side door and to exit the tractor. It seems more believable to the Court that Agent Pena introduced himself as a Border Patrol Agent, asked Defendant a question regarding his citizenship status, and attempted to obtain Defendant's consent following a canine alert.

Second, Defendant testified that seeing the estimated street value — $507,520 — of the marijuana seized on the Border Patrol's sign had a profound impact on him. More specifically, Defendant stated that it made his heart fall in his drawers because knew the impact behind it—"it was a lot." Here, Defendant's testimony seemed disingenuous. Notably, it is difficult for the undersigned to believe that Defendant needed a sign with a

numerical value to help him put his situation into perspective in that "it was a lot" of marijuana. Put simply, Defendant has a semester of college and many years of experience as a truck driver in his background. It seems to the Court that the stacked bundles of marijuana, in and of itself, (*see* Sept. 5th Hr'g, Def. Exs. 1, 3), would be enough for someone to realize "it was a lot" of marijuana and the serious implications resulting from it.

Third, the Court finds Defendant's credibility questionable regarding Agent Barberena's and Agent Schappert's conduct. Contrary to Agent Barberena's testimony, Defendant testified that he was not read his *Miranda* warnings during his interrogation. Defendant further testified, in contrast to the agent's testimony, that Agent Barberena told him that if he told Agent Barberena what was going on, Agent Barberena could probably let him go. Notably, Defendant testified that if he had received those warnings and had not been told that he could be let go, he would have requested an attorney. Here, the Court finds it odd that, within the same hour, when Defendant was told he could not personally speak with an AUSA, Defendant had the wherewithal to request an attorney, supposedly still not having been given his *Miranda* warnings.

Finally, there is another aspect of Defendant's testimony that the Court believes strains Defendant's credibility. Regarding Agent Barberena's alleged representation that Defendant could probably go free if he told "what was going on," Defendant testified that this representation made him feel "relieved." This, the Court has an issue accepting as true. For Defendant to be actually "relieved," there is a requisite presumption that Agent Barberena actually made the representation that Defendant could probably be let go if he talked. In other words, it seems Defendant wants the Court to believe that he was

11

"relieved," thereby providing some credibility to Defendant's claim that Agent Barberena actually made an inappropriate representation. However, the Court does not find Defendant's contention credible. Defendant wants the Court to have the impression that he was "relieved" because he realized that if he told the truth, he could go home. It seems illogical for the opposite to be true, that Defendant felt "relieved" that he could be dishonest with the agents, and could then go home.

However, Defendant's statement to Agent Barberena that he had no knowledge of the marijuana, coupled with the fact that Defendant actually testified that he figured out it was marijuana by the time the agents were unloading the bundles, seems untruthful. There is evidence that contradicts Defendant's assertion regarding lack of knowledge. When Agent Barberena denied Defendant's request to speak with the AUSA, Defendant allegedly stated that people were going to kill his family, and that he needed witness protection—a statement Defendant is attempting to suppress. Moreover, if this "John" wanted to dupe Defendant into unknowingly transporting marijuana, then it seems "John" would have done something more to shield the bundles from Defendant—like stacking them in the rear cargo area underneath the sleeper compartment. Instead, the marijuana bundles were stacked only a few feet from Defendant's head, and a curtain was the only thing separating Defendant from these bundles. (*See* Sept. 5th Hr'g, Gov't Ex. 4).

## II. ANALYSIS

As noted above, Defendant seeks to suppress the evidence resulting from the search of his vehicle at the United States Border Patrol checkpoint. Defendant claims that the controlled substance found in his vehicle was the result of an illegal search and seizure. More specifically, Defendant argues that: 1) the seizure extended beyond

12

purposes of the immigration detention; 2) the canine did not alert to the vehicle; 3) the agents improperly searched the vehicle without consent and without probable cause; 4) the canine's alert, if any, is unreliable because of inadequate training and therefore does not supply probable cause. (Dkt. No. 20, at 3-4). In addition, Defendant argues that his statements should be suppressed because they were the result of an illegal seizure, and the statements were made involuntarily. (*Id.* at 4).

## A. Bandit's Alert Provided Probable Cause to Prolong Defendant's Detention and to Search the Tractor

### 1) Legal Standard

The Fourth Amendment dictates that "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion or wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). However, the Supreme Court has upheld the constitutionality of permanent immigration checkpoints, such that government agents may constitutionally stop vehicles without individualized suspicion that the vehicle or its occupants are involved in wrongdoing. *United States v. Martinez-Fuerte*, 428 U.S. 543, 563, 566 (1976). The Fifth Circuit has emphasized that the scope of an immigration stop is limited to the programmatic purpose of the stop: determining the citizenship status of persons passing through the checkpoint. *United States v. Machuca-Barrera*, 261 F.3d 425, 432-33 (5th Cir. 2001). "The permissible duration of an immigrant checkpoint stop is therefore the time reasonably necessary to determine the citizenship status of the persons stopped." *Id.* at 433. This includes the time necessary to ascertain the number and identity of the occupants of the vehicle, inquire about citizenship status, request identification or other proof of citizenship, and request consent to extend the detention. *Id.*

13

It is an established rule that, if routine questioning at an immigration checkpoint generates reasonable suspicion of other criminal activity, the stop may be lengthened to accommodate its new justification. *United States v. Ventura*, 447 F.3d 375, 378 (5th Cir. 2006) (citing *Machuca-Barrera*, 261 F.3d at 434). Furthermore, the Fifth Circuit has recognized the use of drug-sniffing dogs at immigration stops to be permissible, so long as such use does not lengthen the stop beyond its permissible duration. *See id.* (citing *United States v. Garcia-Garcia*, 319 F.3d 726, 730 (5th Cir. 2003)). Finally, a trained and reliable drug-detecting dog's alert is sufficient to establish probable cause to search a vehicle for drugs. *United v. Sanchez-Pena*, 336 F.3d 431, 434 (5th Cir. 2003).

### 2) Defendant's Detention in the Immigration Checkpoint Did Not Offend the Fourth Amendment

In this case, Agent Meza's use of his canine did not lengthen the stop beyond the initial inquiry regarding Defendant's citizenship status. In fact, the Government's video reflects that Agent Meza and his canine were situated at the driver's side of Defendant's tractor within a couple of seconds of it coming to a stop. (*See* Sept. 5th Hr'g, Gov't Ex. 5). Significantly, with the aid of the immigration checkpoint video, Agent Meza testified that Bandit alerted to the presence of narcotics and/or hidden persons at the cargo door seam at 1:37:31 p.m. (Sept. 5th Hr'g at 9:59-10:00 a.m., 10:05 a.m.). Agent Pena, also with the aid of the video, testified that he was satisfied with Defendant's immigration status as soon as Defendant responded that he was a United States citizen, which he indicated occurred around 1:37:33 p.m. (Sept. 5th Hr'g at 10:47 a.m., 11:02 a.m.). Consequently, Bandit's alert occurred before Agent Pena's determination of Defendant's citizenship status.

### 3) *Canine and Handler are Certified and Reliable, and thus Probable Cause to Search the Tractor was Established Based on Alert*

As detailed above, Agent Meza testified that Bandit alerted to the vehicle at 1:37:31 p.m. As a general proposition, the Fifth Circuit has found that a trained and reliable drug-detecting dog's alert is sufficient to establish probable cause to search a vehicle for drugs. *See United States v. Sanchez-Pena*, 336 F.3d 431, 444 (5th Cir. 2003). To establish that a canine is trained and reliable, all that is required is credible testimony from the canine's handler as to the canine's training, certification, and performance. *United States v. Stevenson*, 274 F. Supp. 2d 819, 822–23 (S.D. Tex. 2002); *see also Sanchez-Pena*, 336 F.3d at 444.

Here, Defendant argues that Bandit's alert is unreliable because of inadequate training, and thus the alert cannot establish probable cause. (Sept. 5th Hr'g at 12:32 p.m.). However, the testimony presented at the September 5th Hearing suggests otherwise. Agent Meza testified that he and Bandit are certified as a team. (Sept. 5th Hr'g at 9:52 a.m., 10:37 a.m.). Agent Meza also described the six-week certification training that he and Bandit underwent in 2009 when the two were first paired. (Sept. 5th Hr'g at 9:44-9:45 a.m.). During training, they were taught how to conduct a number of searches – vehicle searches, open field searches, luggage searches, and interior/exterior building searches. (Sept. 5th Hr'g at 9:46 a.m.). Agent Meza stated that, on a daily basis, instructors would utilize training aids to make sure that the dog was alerting and that the handler was correctly reading the alert. (Sept. 5th Hr'g at 10:37 a.m.). In addition to the daily assessments, the canine and his handler have to complete a final examination of "fourteen searches with fifteen finds" before being certified. (Sept. 5th Hr'g at 10:33

a.m.).  Moreover, the canine handler must successfully score eighty percent or higher in order to pass a written test at the end of training.  (*Id.*).

Even after certification, canine and handler together must complete eight hours of further training with the canine instructor every two weeks; otherwise, the canine and handler will together be decertified. (Sept. 5th Hr'g at 9:52 a.m.).  In addition, every year canine and handler must be recertified by successfully passing the same certification field test.  (Sept. 5th Hr'g at 10:34 a.m.).

Bandit, like other dogs assigned to work with Border Patrol agents, is specifically trained to detect concealed contraband and hidden people.  (Sept. 5th Hr'g at 9:48 a.m.). Over the three-year period working with Bandit, Agent Meza testified that Bandit has alerted to ten separate narcotics loads between .05 pounds and 1,888 pounds, all of which have been marijuana.  (Sept. 5th Hr'g at 9:49 a.m.).  Bandit's last narcotics seizure was a 64 pound marijuana bundle abandoned by the riverbank.  (Sept. 5th Hr'g at 9:50 a.m.). Agent Meza further testified that Bandit has had a number of human finds "in the brush." (Sept. 5th Hr'g at 9:51 a.m.).

Despite Agent Meza's testimony regarding Bandit's training, certification, and performance, Defendant argues that there is still no assurance as to Bandit's reliability. Defendant supports this contention by pointing out that at no point during Bandit's certification or continued training did Border Patrol maintain records of Bandit's non-productive alerts; thus the accuracy of Bandit is unknown.  (Sept. 5th Hr'g at 10:18 a.m., 12:29 p.m.).  As such, Defendant concludes that the canine alert could simply be "guess work." (Sept. 5th Hr'g at 12:31 p.m.).  Additionally, Defendant cites *Harris v. State*, in which the Florida Supreme Court noted that "any presumption of reliability based only

16

on the fact that the dog has been trained and certified does not take into account the potential for false alerts, the potential for handler error, and the possibility of alerts to residual odors." (Dkt. No. 20, at 7). The United States Supreme Court has granted certiorari in that case (*Florida v. Harris*, cert. granted, __U.S.__, 132 S.Ct. 1796 (March 26, 2012)) for further review.

Be that as it may, Defendant also notes that this issue has previously been addressed by the Fifth Circuit. *See Sanchez-Pena*, 69 F.3d at 28 (holding that "a showing of the dog's training and reliability is not required if probable cause is developed on site as a result of a dog sniff of a vehicle."). Moreover, contrary to Defendant's criticism that the U.S. Border Patrol did not maintain records of Bandit's nonproductive alerts, some district courts have explicitly stated that the government "does not have the additional burden of producing field work records or detailed training records in order to establish the reliability of the canine alert." *United States v. Outlaw*, 134 F.Supp.2d 807, 813 (W.D. Tex. 2001); *see also United States v. Stevenson*, 274 F.Supp.2d 819, 821 (S.D. Tex. 2002).

In summation, there appears to be no dispute in this case that Bandit and Agent Meza completed the mandatory training procedures and standardized testing required for Border Patrol canines. There is also no question that both Agent Meza and Bandit were certified under those same standards on June 2, 2012. Agent Meza testified regarding Bandit's performance and previous alerts, which resulted in ten previous marijuana seizures. Notably, Defendant failed to elicit any specific testimony from Bandit's canine handler or present testimony through his own witnesses that would call into question

17

Bandit's reliability.[7]  As such, the undersigned concludes that Bandit is a trained and reliable canine, whose alert is sufficient to establish probable cause to search a vehicle. Further, the undersigned finds that Agent Meza is a certified canine handler.

### 4)  Defendant's Contention that Bandit Did Not Alert is Without Merit

Defendant alternatively argues that Bandit never alerted to the tractor.  (Dkt. No. 20, at 6).  Defendant contends that Agent Meza might have misread Bandit, and Agent Meza's interpretation that Bandit alerted was, in fact, just involuntary breathing.[8]  (See Sept. 5th Hr'g at 10:15 a.m., 12:28 p.m.).  In support of this argument, Defendant claims that (1) "the alert that Agent Meza testifie[d] to is a sniff," which is an involuntary process, and (2) at 1:38:00 p.m. on the immigration checkpoint video, Bandit is looking away from the tractor, because there was no alert.  (Sept. 5th Hr'g at 12:27-12:28 p.m.).

First, the undersigned notes the Agent Meza's collective testimony indicates that Bandit's reaction was more than just "involuntary breathing" along the driver's side of Defendant's tractor.  He testified that an alert is "a change in body posture and increased respiration" when the canine first encounters the odor he was trained to detect.  (Sept. 5th Hr'g at 9:45 a.m.).  Bandit specifically alerts by "an increase in respiration," such that he

---

[7] Both sides did elicit testimony from Agent Meza that Bandit was likely between ten and eleven years old, since the United States Border Patrol acquired Bandit in 2003.  (Sept. 5th Hr'g at 9:48 a.m., 10:11 a.m.).  It is unclear, though, why Bandit's age is a factor Defendant thinks necessarily tends towards Bandit's *unreliability*, rather than his *reliability*, since Bandit has nearly ten years of experience with the Border Patrol.

[8] Defendant also attempts to persuade the Court that Bandit did not sit, and therefore did not alert.  (Sept. 5th Hr'g at 12:29 p.m.).  However, this argument ignores Agent Meza's testimony regarding the basic distinction between an alert and an indication.  Agent Meza testified that an indication is a trained behavior that pinpoints the source, whereas an alert is when the canine first encounters the odor he was trained to detect.  (Sept. 5th Hr'g at 9:46 a.m.).  Bandit has a passive indication, which means he will either sit or pinpoint stare once he has pinpointed the source.  (Sept. 5th Hr'g at 10:24 a.m.).  Bandit's alert, by contrast, involves a change in body posture and increased respiration.  (Sept. 5th Hr'g at 9:47 a.m.).  Here, Agent Meza's testimony is simply that his canine alerted to both the driver side and passenger side of the tractor.  (Sept. 5th Hr'g at 10:07-10:08 a.m.).

closes his mouth and starts breathing through his nose rapidly. (Sept. 5th Hr'g at 9:48 a.m.). Significantly, Bandit's alert is different than both his normal breathing and his breathing when he is sniffing meat or other items. (Sept. 5th Hr'g at 10:31 a.m.). Agent Meza clarified that Bandit's alert is associated with his looking for a "toy." (*Id.*) A "toy" is what the canine associates as his payment or reward for identifying the odors that he is trained to detect. (Sept. 5th Hr'g at 10:13-10:14 a.m.).

The undersigned can understand the difficulty that an untrained person would have in distinguishing a potential alert from a canine's breathing pattern. As prior cases have noted, "a canine alert is not always an objectively verifiable event," *Outlaw*, 134 F.Supp.2d at 813, because the alert may be as subtle as a particular position or stance. *United States v. Dovali-Avila*, 895 F.2d 206, 207 (5th Cir. 1990). As noted above, it is during the initial six-week training period that the canine handler comes to learn how his canine alerts. After that, there is mandatory bi-weekly training that both a canine and his handler must complete. Moreover, there is also yearly recertification as a team. Based on the three years of experience Agent Meza has had with Bandit, it seems highly likely that Agent Meza knows how to interpret Bandit's alerts, especially considering Bandit has consistently alerted the same way during his prior ten narcotics finds – by "breathing hard." (Sept. 5th Hr'g at 9:49-9:50 a.m.). Agent Meza further testified that Bandit alerts in the same manner to the presence of humans. (Sept. 5th Hr'g at 9:51 a.m.).

Defendant further points out that at 1:38:00 p.m., Bandit is looking away from the tractor.[9] Defendant thus concludes that because Bandit is looking away from the vehicle

---

[9] Defendant incorrectly suggests that Bandit is looking away from the vehicle "within a second" of the alert. (Sept. 5th Hr'g at 12:27 p.m.). The testimony regarding the time of events, given in reliance on the video played during the hearing, indicates that Bandit's facing away from the tractor was about 30 seconds after his initial alert. *See supra* Section I (listing the exact timing of occurrences).

at this time, then Bandit is disinterested in the vehicle and never in fact alerted.  (Sept. 5th Hr'g at 12:27 p.m.).  However, Agent Meza explained that Bandit was looking away, because "that's when [he] pulled him back," in order to circle the tractor to "reconfirm the alert on the other side" of the tractor.  (Sept. 5th Hr'g at 10:20-10:21 a.m., 10:22 a.m.).  The undersigned further notes the Bandit was looking away for only a couple of seconds, at most.  (*See* Sept. 5th Hr'g, Gov't Ex. 5 at 1:38:00 p.m.).  The Court cannot agree with the proposition that simply because Bandit is looking away from the vehicle at 1:38:00 p.m., after being specifically pulled away from the tractor by Agent Meza, it necessarily follows that Bandit did not alert in the first instance.  Thus, the testimony given at the hearing assures the Court that Bandit did, in fact, alert to Defendant's vehicle.

As described above, the testimony provided at the hearing established that Bandit's alert came prior to Agent Pena's ascertainment of Defendant's citizenship status. As such, Bandit's alert provided new justification for Defendant's detention outside the context of verifying his citizenship.  The undersigned concludes that Bandit was a trained and reliable canine.  Therefore, Bandit's alert established that there was probable cause to search the tractor for drugs or undocumented aliens.

### B. Assuming Arguendo That Bandit Was Not a Reliable Canine or That There Was No Alert, There Was Still Consent

Even for argument's sake, if the Court were to find that the canine alert did not establish probable cause or even that the alert did not occur, the checkpoint detention was nonetheless lawful because of Defendant's consent.

As noted above, the Fifth Circuit has indicated that the "permissible duration of the [immigration] stop is limited to the time reasonably necessary to complete a brief

investigation of the matters justifying the stop." *Machuca-Barrera*, 261 F.3d at 432. This includes "the time necessary to ascertain the number and identity of the occupants of the vehicle, inquire about citizenship status, request identification or other proof of citizenship, and request consent to extend the detention."[10] *Id.* at 433. The *Machuca-Barrera* Court further explained that "[i]t is the length of the detention, not the questions asked, that makes a specific stop unreasonable . . . ." *Id.* at 432; *see also United States v. Chacon*, 330 F.3d 323, 327 (5th Cir. 2003).

The Fifth Circuit has since reiterated and clarified the *Machuca-Barrera* holding. In *United States v. Jaime*, 473 F.3d 178 (5th Cir. 2006), the court noted that one principle relied on in *Machuca-Barrera* is that "the permissible duration of a suspicionless stop at a fixed immigration checkpoint *includes* the time necessary to 'request consent to extend the detention.'" *Jaime*, 473 F.3d at 183 (quoting *Machuca-Barrera*, 261 F.3d at 433) (emphasis in original). Thus, the suspicionless detention at issue in *Machuca-Barrera* was legal "*because* its *duration*, up to the time he gave his consent to search, was objectively reasonable . . . ." *Id.* at 184 (emphasis in original). Repeatedly, Fifth Circuit courts have focused on the time elapsed between initial contact and consent given by the defendant. *See Jaime*, 473 F.3d at 185 (concluding that the period of less than half a minute, from the first question to the time defendant gave consent, was not excessive and thus her detention was legally valid); *Machuca-Barrera*, 261 F.3d at 435 (noting that the brief stop by the agent lasted no more than a couple of minutes before the agent requested and received consent to search); *see also United States v. Hinojosa-Echavarria*, 250

---

[10] Asking for consent is a permissible non-immigration question. *United States v. Jaime*, 473 F.3d 178, 185 (5th Cir. 2006). The Fifth Circuit has stated decidedly that "it is necessarily irrelevant whether a non-immigration question comes before, rather than immediately following, the completion of the immigration questions and answers, for in either event the duration of the stop is equally extended, and . . . in either event the extension of the stop's duration is permissible." *Id.*

Fed.Appx. 109, 113 (5th Cir. 2007) (reasoning that one to one and one half minutes did not exceed the permissible duration of an immigration stop); *United States v. Maldonado*, 241 Fed.Appx. 198, 201 (5th Cir. 2007) (claiming that, because the initial questioning at the checkpoint, including when defendant consented to the search, "took no more than one minute," the duration was permissible under plain error review).

In this case, Defendant testified that he did not give consent to the agents to search his vehicle, and was simply told to open the door. (Sept. 5th Hr'g at 12:02 p.m.). However, as noted above, the undersigned does not find his testimony to be credible. Agent Pena testified that he identified himself as a Border Patrol agent and asked if Defendant was a United States' citizen. (Sept. 5th Hr'g at 10:46 a.m.). Once Agent Pena was given the "cue" by Agent Meza, he asked Defendant if he could look inside the sleeper compartment, and also if Defendant would open the small cargo door on the lower side of the tractor. (Sept. 5th Hr'g at 10:48 a.m.). Notably, Agent Meza corroborates Agent Pena's testimony to some extent because he testified that he heard Agent Pena ask Defendant for his consent. (Sept. 5th Hr'g at 10:02 a.m.). Agent Pena stated that Defendant gave a verbal affirmative response. (Sept. 5th Hr'g at 10:48 a.m.).

Agent Pena asked only two questions, including the request for consent. Significantly, from Agent Pena's and Agent Meza's testimony and by viewing the Government's video, the undersigned estimates that the time period from Defendant's tractor coming to a stop until Agent Pena's request for consent was less than ten seconds. (*See supra* Section I.A.; Sept. 5th Hr'g, Gov't Ex. 5). Accordingly, this was not an impermissible duration of a suspicionless stop at a fixed immigration checkpoint. As such, once Defendant's consent for the search was obtained, Agent Pena needed no

22

further justification for prolonging the immigration stop. *See Martinez-Fuerte*, 428 U.S. at 567; *Machuca-Barrera*, 261 F.3d at 435.

### C. Defendant's Statements Were Not Involuntary

Defendant also attempts to persuade the Court that his statements made once inside the Border Patrol station are subject to suppression because the statements were involuntary statements, taken against Defendant's will.[11] (Dkt. No. 20, at 4).

#### 1) Legal standard

The Government bears the burden of proving, by a preponderance of the evidence, that the statements made during an interrogation were voluntary. *United States v. Rojas-Martinez*, 968 F.2d 415, 417–18 (5th Cir. 1992) (citing *Colorado v. Connelly* 479 U.S. 157, 168–69 (1986)). The voluntariness of a Defendant's statements is reviewed based on the totality of the circumstances surrounding the interrogation. *Dickerson v. United States*, 530 U.S. 428, 437 (2000); *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005). To render a confession involuntary, a defendant must demonstrate that law enforcement officers engaged in coercive conduct and that there was a causal link between the officer's coercive conduct and the confession. *United States v. Bell*, 367 F.3d 452, 461 (5th Cir. 2004) (citing *Connelly*, 479 U.S. at 163–65). Coercive conduct refers not only to physical violence but also to other deliberate means calculated to break the defendant's will, *see Oregon v. Elstad*, 470 U.S. 298, 312 (1985), including direct or subtle forms of psychological persuasion. *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996). The Fifth Circuit has been careful to note that

---

[11] Defendant alternatively contends that his statements should be suppressed because they were the result of an illegal seizure. (Dkt. No. 20, at 4). However, this argument has already been foreclosed by the undersigned's finding that there was no illegal seizure. As such, the only argument that will be addressed is that Defendant's statements are subject to suppression because they were taken against his will.

"coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *United States v. Reynolds*, 367 F.3d 294, 298 (5th Cir. 2004).

2) *Defendant's statements were not the result of any form of coercion*

Defendant first asserts that he was not provided his *Miranda* warnings. Contrary to Defendant's testimony, which the undersigned does not find credible, Agent Barberena testified that Agent Schappert read Defendant his *Miranda* warnings from a DEA-13A card. (Sept. 5th Hr'g at 11:21-11:23 a.m.). Defendant acknowledged his rights, and nonetheless allowed the agents to speak with him. (*Id.*) As dictated by the Supreme Court, questioning by law enforcement must cease only where the defendant unequivocally invokes their *Miranda* rights. *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2259–60 (2010). If the government can establish that a *Miranda* warning was given and that it was understood by the defendant, any uncoerced statements will establish an implied waiver of *Miranda*. *See id.* at 2261–62. An explicit acknowledgement of his rights by Defendant suffices to meet this standard.

Notably, Defendant also attempts to argue that that there were subtle forms of psychological persuasion by the agents that amounted to coercion, which thus led to his statements being involuntary. Defendant argues that the overt display of the marijuana bundles with a sign indicating its estimated street value and the emphasis on the implausibility of Defendant's story constituted "psychological persuasion." (Sept. 5th Hr'g at 12:34 p.m.).

First, the undersigned is not persuaded that Defendant's visual exposure to the marijuana bundles and Border Patrol's sign overbore Defendant's will to the extent that

his statements were not the product of his own choice. Courts within the Fifth Circuit have previously held that the display of evidence related to the criminal activity does not negate the voluntariness of those statements. *See Muniz v. Johnson*, 132 F.3d 214, 219 (5th Cir. 1998) (concluding that the display of murder scene pictures, among other factors, did not make defendant's confession involuntary); *Pemberton v. Collins*, 991 F.2d 1218, 1226 (5th Cir. 1993) (refusing to find that defendant's exposure to gruesome murder pictures constituted psychological persuasion such that his confession was not "the product of a rational intellect and a free will").

Second, although Fifth Circuit case law regarding the issue is sparse, other circuits' courts have found that law enforcement agents' expressions of disbelief do not amount to coercion. *See Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997) (deciding that the officers' repeated provocations to tell the truth and not to lie did not amount to coercion); *Evans v. Dowd*, 932 F.2d 739, 742 (8th Cir. 1991) (refusing to conclude that the officer's misstatement of the purpose of the interrogation, his statements of disbelief, and his untrue suggestions of eyewitnesses amounted to unconstitutional coercion); *United States v. Wolf*, 813 F.2d 970, 975 (9th Cir. 1987) (concluding that an officer's accusations of lying do not "automatically render the questioning coercive, as an interrogator can legitimately express his disbelief at a defendant's story in order to elicit further comments or explanations."); *United States v. Preston*, No. CR-10-8026-PCT-GMS, 2011 WL 196852, at *5 (D. Ariz. Jan. 20, 2011) (finding that, after the defendant's initial denial that the victim had been over his house and his later assertion that nothing happened, the law enforcement agents' expressions of disbelief were not tantamount to coercion); *United States v. Guerrero-Sanchez*, No. 09-

10111-WEB, 2009 WL 5030732, at *2 (D. Kan. Dec. 15, 2009) (determining that there was no duress or coercion as a result of the officer's repeated expressions of disbelief at the defendant's story); *United States v. James*, No. CR-03-900-PHX-MHM, 2006 WL 2456224, at *4 (D. Ariz. Aug. 21, 2006) (noting that "the fact that the officers challenged the Defendant to tell the truth as well as expressed disbelief to his omission of details that they felt Defendant purposefully left out does not suggest coercion."); *United States v. Wylie*, No. 3:05CR353, 2006 WL 1431656, at *4 (W.D.N.C. May 19, 2006) (stating that "neither expressing disbelief in the statements of the defendant . . . nor continuing to question on specific matters constitute coercion.  Such tactics often are necessary to achieve the truth.").

Considering the case law delineated above, the undersigned finds that Agent Barberena's expression of disbelief, due to the implausibility of Defendant's story, did not constitute coercion.  Significantly, during Defendant's testimony, when he was asked why Agent Barberena chose to use the language he did, Defendant simply stated that "bullshit" meant the agent "did not believe [him]."  (Sept. 5th Hr'g at 12:11 p.m.). Defendant made no indication to the Court that Agent Barberena's specific language had any coercive impact on him above and beyond the general fact that the agent insisted he did not believe Defendant's story.  Although the undersigned recognizes that Agent Barberena could have expressed his disbelief in a better manner, his choice of expression cannot be said to have rendered Defendant's statements involuntary.

Defendant alternatively suggests that Agent Barberena's promise of leniency made his statements involuntary.  Defendant argues that he was promised he "could probably [be] let go" if he told Agent Barberena what was going on, and it was for this

reason that Defendant forwent an attorney and explained his rationale for driving the truck. (Sept. 5th Hr'g at 12:10 p.m.). As noted previously, Agent Barberena denies making any such promises to Defendant. (*See* Sept. 5th Hr'g at 11:38 a.m.). Rather, Agent Barberena asserted that he simply told Defendant about the seriousness of the situation, and that there was a lot of incarceration time at stake. (Sept. 5th Hr'g at 11:35 a.m.). Agent Barberena explicitly stated that no threats, no promises, and no offers of leniency were made. (Sept. 5th Hr'g at 11:29 a.m.). He explained that he never told Defendant he would be let go, because he was only allowed to tell Defendant what was going on, and no more. (Sept. 5th Hr'g at 11:38 a.m., 11:43 a.m.). Anything further, and he would need to speak to the AUSA first. (Sept. 5th Hr'g at 11:39 a.m.). The undersigned again finds the agent's testimony to be more persuasive than Defendant's.

In attempting to define a standard of conduct which would render a defendant's statements involuntary, the Fifth Circuit has held that informing the accused that there are advantages to cooperating does not render a confession involuntary. *Broussard*, 80 F.3d at 1034 (citing *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978)). The Fifth Circuit has also found that "[a] truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will." *Ballard*, 586 F.2d at 1063. Likewise, "telling [the] defendant in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government." *Id.* In the instant case, informing Defendant of the serious nature of the case, as well as the lengthy incarceration possible because of the amount of narcotics, amounts to nothing more than a truthful appraisal of the situation.

27

As *Ballard* notes, "[s]uch an account [of the possible penalties] may increase the chance that one detained will make a statement," but a truthful appraisal of the situation does not render Defendant's statement involuntary. *Id.*

Defendant also points to the "continued confrontation" as evidence of the involuntary nature of his statements. (Sept. 5th Hr'g at 12:34 p.m.). Defendant specifically points to the break in the interrogation immediately following Agent Barberena's verbalization of his disbelief, compounded by Agent Barberena's return ten minutes later to resume the interrogation, as evidence of psychological persuasion. Drawing out this argument to its conclusion, Defendant seemingly suggests that Agent Barberena either 1) should have immediately terminated the interview after his expression of disbelief and not returned, or 2) should have continued the interrogation uninterrupted, without providing Defendant that opportunity to reflect. The undersigned notes that Defendant cites to no legal authority to support his proposition that the agent's use of a ten to fifteen minute break constituted psychological persuasion, and the undersigned cannot find any cases which would suggest the same. Nor does there seem to be any case law which suggests that an interrogation must permanently cease after an officer has determined that the defendant is not being truthful. Rather, it could be argued that the short break Agent Barberena provided Defendant had a diffusing effect on the situation, and had Agent Barberena continued to press Defendant for information after stating that his story was not believable, it would constitute more psychological coercion, if any, rather than less. Thus, the undersigned does not view the ten minute "timeout," where Defendant had the opportunity to reflect on whether he was being truthful and to reflect on whether he should request an attorney, as psychological coercion.

Generally, as part of the "totality of the circumstances" evaluation, courts must consider the conditions under which the interrogation occurred. The Supreme Court has instructed courts to consider such factors as the accused's intelligence; the length of detention; whether the questioning was prolonged; and whether physical punishment was used, such as deprivation of food or water. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973).

On June 2, 2012, Defendant was brought into the Border Patrol station around 1:40 p.m., and his interview began around 5:00 p.m. Therefore, Defendant was detained by the Border Patrol for slightly over three hours by the time his interview began. The interrogation finished by around 5:45 p.m., indicating that the whole conversation took about forty-five minutes. In addition, Defendant had access to water in his holding cell, and there is no indication that he was hungry, tired, thirsty, or otherwise uncomfortable. (Sept. 5th Hr'g at 11:20 a.m.). The Court cannot concede that an interrogation under these conditions, an interrogation which lasted under an hour, suffices to overbear Defendant's will. *See United States v. Cardoza*, 136 Fed.Appx. 700, 702 (5th Cir. 2005) (refusing to find that a seven hour detention without food and within minimal liquid refreshment rendered defendant's confession involuntary); *Gibson*, 108 Fed.Appx at 977 (finding that the failure to inform the defendant that he could take a break, use the bathroom, or eat lunch did not render the confession involuntary). Given the circumstances, and given the additional fact that Defendant's educational background includes some college courses, the undersigned concludes that Defendant's statements were voluntary.

In summation, though the marijuana bundles were visible to the Defendant throughout the interrogation, the presence of the drugs does not negate the voluntariness of Defendant's statements.  Agent Barberena's straightforward expressions of disbelief also do not render Defendant's statements involuntary; nor does Agent Barberena's truthful appraisal of Defendant's potential situation.  Further, when considered in the "totality of the circumstances," there is no evidence that the conditions contributed to the involuntariness of the statements.  As such, the agent's testimony suffices to meet the Government's burden of showing, by a preponderance of the evidence, that Defendant's statements were voluntary.

## III. RECOMMENDATION

For these reasons, the Magistrate Judge RECOMMENDS that the District Judge, after an independent review, DENY Defendant's Motions to Suppress.

### A. Objections

The parties are on notice that they have fourteen (14) days from the date on which they are served with a copy of this Report and Recommendation to file specific written objections to the findings, conclusions, and recommendations of the Magistrate Judge. 28 U.S.C.A. § 636(b)(1). A party's failure to file written objections to the findings, conclusions and recommendations contained in this report within fourteen days after service shall bar that party from *de novo* review by the District Judge of those proposed findings, conclusions and recommendations. *Id.* Failure to file written objections within the fourteen days after service shall also bar that party, except on grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal

conclusions accepted by the District Judge. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Douglass v. United Services Auto. Assn.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

Unless the District Judge directs otherwise, the objecting party must promptly arrange for transcribing the record, or whatever portion of it if the parties agree to or the Magistrate Judge considers sufficient. Fed. R. Crim. P. 59(b)(2).

SIGNED this 16th day of October, at Laredo, Texas.

J. SCOTT HACKER
United States Magistrate Judge